**\*NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| KEVIN D. HAYES, | : | |
| | : | Civil Action No. 13-4266 (SDW) |
| Plaintiff, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| S.C.O. BERGUS, et al., | : | |
| | : | |
| Defendants. | : | |

**WIGENTON**, District Judge:

Presently before the Court is Defendants' motion for summary judgment. (ECF No. 54). Plaintiff filed both an opposition brief and a supplemental response to the motion (ECF Nos. 56, 57), to which Defendants have replied. (ECF No. 58). For the following reasons, this Court will grant the motion in part and dismiss the complaint as Plaintiff has failed to properly exhaust his administrative remedies.

**I. BACKGROUND**

**A. Plaintiff's excessive force claims**

The facts underlying Plaintiff's actual § 1983 claims are relatively straightforward and the following summary of those facts is drawn from Plaintiff's deposition in this matter. On December 4, 2012, at approximately 6:30 a.m., Plaintiff left his cell at Northern State Prison and went to the prison's pass office and retrieved the Daily Pass Sheet for the prison's medical facility, which Plaintiff asserts he did regularly as a favor to a prison officer who was not working that day.

(Document 2 attached to ECF No. 54 at 61-62). Plaintiff then went to the prison's medical facility to receive diabetic testing and insulin before proceeding to the prison kitchen for his work assignment. (*Id.*). According to Plaintiff, he was regularly permitted to skip the line for insulin because, as a kitchen worker, he was required to be prepared to go to his work station before other prisoners as kitchen workers are subject to a special frisking procedure. (*Id.*).

When Plaintiff arrived at the medical facility, he attempted to hand the pass sheet to Defendant Bergus and proceed to get his insulin. (*Id.* at 62). According to Plaintiff, Bergus was belligerent with him regarding the pass list, ordering him to return it to the office, and then ordering Plaintiff to place it on his desk. (*Id.*). Bergus then prevented Plaintiff from moving to the front of the line and ordered him to stand in line for his insulin like everyone else. (*Id.*). Plaintiff then attempted to dispute this with Bergus, telling him that kitchen workers are regularly permitted to go first because of the special movement procedures requiring them to be ready to move earlier than other prisoners, to no avail. (*Id.*). Plaintiff then started walking away, saying "[e]very day is something new," which caused Bergus to "jump up" demand Plaintiff repeat what he said and direct Plaintiff to stand against the wall. (*Id.*). Plaintiff then stood facing the wall, at which point Bergus told him he would be locked up and called for a sergeant. (*Id.*).

After Bergus called for a sergeant, Plaintiff once again was ordered against the wall, and Plaintiff turned, faced the wall, and leaned over so that he could be frisked. (*Id.* at 63). Plaintiff contends that Bergus then "put his forearm in the back of [his] neck and shove[d Plaintiff] closer to the wall" and called a code 1033, indicating a fight and requesting backup. (*Id.*). In his deposition, Plaintiff states that he then turned to ask the officer why he called a Code 1033, at which point the officer apparently struck Plaintiff in the mouth with his hand radio. (*Id.*).

2

Plaintiff further stated that the officer then began to try and hit him, at which point Petitioner began to fight back by pushing the officer away, resulting in a struggle between the two men. (*Id.* at 64). Both men struck each other during this fight. (*Id.*).

At that point, several other officers arrived. (*Id.*). The first such officer "jumped" on Plaintiff's back and brought him to the floor, at which point Plaintiff says Bergus struck him in the back of the head, possibly with an object of some kind, resulting in bleeding. (*Id.*). Plaintiff contends that Bergus continued to strike him until the other officer ordered him to stop. (*Id.* at 65). Several other officers then arrived, including Defendant McGill. (*Id.* at 67). While Plaintiff was being restrained and handcuffed on the ground, Plaintiff states that he was kicked in the face. (*Id.*). Plaintiff looked up, and saw McGill trying "to disappear in the crowd." (*Id.*). It is not clear from Plaintiff's deposition whether he actually saw McGill deliver the kick, but Plaintiff did state that he looked up immediately after being kicked and saw McGill and that he "think[s]" that McGill is the one who kicked him. (*Id.*).

In their reports, the corrections officers provide a somewhat different account of the events of December 4, 2012. Defendant Bergus summarized the events as follows in his report:

> while [Bergus] was assigned to [the] clinic area [Plaintiff approached Bergus] and [said] "he was gonna get my insulin now." [Bergus a]dvised [Plaintiff] to wait on line [and Plaintiff responded] "Fuck you you motherfucking white boy[.]" [Bergus] again instructed [Plaintiff] to get on line, and he could be next when [an] opening happened. [Plaintiff] refused again cussing and became hostile in nature. [Bergus] ordered him to get on line and called [a sergeant] to send two [officers] because of a possible problem. [Plaintiff] stood on line while [Bergus] called [the sergeant again] at which point [Plaintiff] stepped out again and said "I said motherfuck[er] I need my insulin I gotta go to work." [Bergus] ordered [Plaintiff] back into [the] room and he became more belligerent [and] tr[ied] to incite the other inmates to violence. At

3

> [that] point[, Bergus] ordered [Plaintiff] out of [the] waiting room and to go to . . . face [the] wall. While [Bergus] again called [for two officers] to escort [Plaintiff] out of [the] area . . . [Plaintiff] turned around and struck [Bergus] in the face with [a] closed fist. [Bergus] called a [Code 1033] and defended [him]self until [a] response team arrived and cuffed [Plaintiff] while [Bergus] was taken to [receive medical treatment.]

(Document 2 attached to ECF No. 54 at 16-18). Likewise, while the other officers report that Plaintiff resisted when they first arrived, they state in their reports that Plaintiff ultimately acceded to orders that he cease struggling, and was handcuffed after a minor scuffle. (*Id.* at 19-39). These other officers make no mention of Bergus striking Plaintiff after he was restrained, nor of any kick to Plaintiff's face by McGill. (*Id.*).

Following the fight, Plaintiff received several disciplinary charges arising out of his scuffle with officer Bergus. (*Id.* at 70-71). That same day, Plaintiff was transferred to New Jersey State Prison. (Document 3 attached to ECF No. 54 at 2). According to Plaintiff, the charges against him were dismissed a couple of weeks after his transfer to New Jersey State Prison. (Plaintiff's Deposition, Document 2 attached to ECF No. 54 at 70-71). Plaintiff specifically stated during his deposition that the charges were dismissed for lack of evidence because "Northern State [Prison] refused to turn over evidence," which Plaintiff suggests is a common practice. (*Id.* at 71). Plaintiff also suggests that the evidence which could have been turned over was a tape of the entire fight incident. (*Id.*). The reports submitted by Defendants, however, seem to indicate that the only tape taken relating to the fight was a recording of Plaintiff being taken from the scene of the fight to medical and ultimately lockup. (*See* Corrections Officer's reports, Document 2 attached to ECF No. 54 at 18-40). It is not clear from the current record whether there was a camera which would have otherwise filmed the exchange between Bergus and Plaintiff.

4

### B. The prison exhaustion procedures

In their motion for summary judgment, Defendants submit the certification of Jessica Smith, who has served as the Inmate Remedy Coordinator for New Jersey State Prison since December 2013. (Document 3 attached to ECF No. 54 at 1). In her certification, Smith describes in detail the procedures used at New Jersey State Prison to address inmate claims and complaints. (*Id.*). According to Smith, all inmates at New Jersey State Prison had access to the prison's "Inmate Request System and Remedy Forms ("IRFs")" which are used by inmates to address their grievances with prison conditions and events. (*Id.* at 4). Smith also asserts that each prisoner is provided with the rules governing this system during their prison orientation which occurs whenever they are transferred into New Jersey State Prison from another institution. (*Id.* at 2-3). Smith described the procedures for properly filing an IRF and pursuing it through administrative appeals as follows:

> Inmates submit the[ir] IRF to the IRF Coordinator by depositing it in a specially marked collection box located in the common area of [their] housing unit compound. As such, it is accessible to the inmate during all hours that he is not required to report to his cell.
>
> If an inmate cannot access that box because he is not assigned to a general assignment unit (for example, if he is assigned to Administrative Segregation or Protective Custody), he is to give the IRF to his housing unit officer, who will place it in the proper collection box.
>
> As pointed out [to prisoners including Plaintiff] during orientation, any other form of submission of the IRFs besides placement in the drop box (whether by the inmate himself if he is in general population or by the housing unit officer if the inmate is not)

5

is improper and will not be addressed.

Once the inmate completes the IRF and submits it to the IRF coordinator properly, the IRF is assigned a case number and then given to the appropriate staff member or departmental supervisor for a response. If, however, the IRF submitted does not comply with the procedures, the IRF coordinator shall not accept it and shall not assign it with a case number. Instead, the IRF coordinator shall return it to the inmate with a Corrective Action Form, which should advise the inmate of what errors in the IRF need to be corrected before re-submission.

After the inmate receives the initial staff response to an IRF that has been accepted and filed, he can appeal it to the prison administration by completing part 4 of the IRF (the "Administrative Appeal" section) and resubmitting it in the proper manner as set forth below[.]

The inmate is to wait 30 days to receive a staff response to his IRF. If he should submit another IRF raising the same issue sooner than that, the second IRF will not be accepted.

If the inmate does not receive an initial response within 30 days of submission, however, he is able and invited to send a follow-up IRF.

If the inmate is dissatisfied with the response shown in Part 3 (Staff Response) of the IRF, he may appeal the response by completing Part 4 (Inmate Appeal) and re-submitting it within ten (10) days of receipt of same. That appeal will be directed to the prison administrator or his/her designee, to provide a final response.

Once the inmate receives the response to his appeal in Part 5 of the IRF, he has exhausted his available administrative remedies.

(*Id.* at 4-6, paragraph numbers omitted). Ms. Smith further certified that "[m]ailing [an] IRF to another correctional facility [rather than placing it in the collection box or having one's housing unit officer or social worker to be placed into the box] does not comply with procedures set forth during orientation for [the] exhaustion of administrative remedies." (*Id.* at 8).

6

### C. Plaintiff's exhaustion attempts

In his deposition, Plaintiff admitted that he was well-acquainted with the prison grievance system in place at both Northern and New Jersey State Prisons. (Document 2 attached to ECF No. 54 at 75). Indeed, in her certification, Ms. Smith averred that Plaintiff submitted numerous IRF's during his time in New Jersey State Prison, and prison records indicate that, upon his transfer to New Jersey State Prison, Plaintiff went through an orientation that included a refresher on prison remedy rules. (Document 3 attached to ECF No. 54 at 3-4; *see also* Document 2 attached to ECF No. 54 at 72). Both Plaintiff at his deposition and Ms. Smith in her certification based upon records she reviewed agree that Plaintiff submitted numerous IRFs regarding other incidents using proper procedures, that Plaintiff knew about and used the appellate process for those IRFs, and that Plaintiff normally received responses to his IRFs and appeals. (Document 3 attached to ECF No. 54 at 6-7; Document 2 attached to ECF No. 54 at 75-76).

As relates to this particular incident, the altercation on December 4, 2012, however, Plaintiff did not receive responses to the IRFs which he allegedly submitted. According to Ms. Smith, there were no documented IRFs concerning this incident on file at New Jersey State Prison, although several other IRFs on other incidents were located. (Document 3 attached to ECF No. 54 at 6-9). The reason for this lack of response, however, appears to be because Plaintiff used a different approach for filing his IRF as to this incident than is normally used.

During his deposition, Plaintiff stated that the difference between his other IRFs and those he submitted regarding the medical unit fight was that Plaintiff was not incarcerated in the institution to which he complained. (Document 2 attached to ECF No. 54 at 75). As Plaintiff

7

explained, because he was not at Northern State Prison after the beating, when he chose to file IRFs he did so not by filing them in the box or with a housing unit officer as required by New Jersey's prison grievance procedures, but instead by mailing his IRFs back to Northern State Prison.  (*Id.* at 75-76).  Plaintiff specifically stated that he submitted the IRF concerning the attack to Northern State Prison through "regular daily mail," and that when he did not receive a response, he mailed further copies of his IRF to several New Jersey DOC officials including the acting Attorney General of New Jersey, DOC Commissioner Gary Lanigan, Administrator Lagana, and to the DOC's Special Investigations Division ("SID").  (*Id.*).   When directly asked at his deposition how he filed the approximately five IRFs he submitted regarding the incident, Plaintiff stated that he filed them all while at New Jersey State Prison by "put[ting them] in the mail and sen[ding them] to Northern State Prison."  (*Id.* at 77).

Because he did not receive responses from these mailed IRFs and letters to various DOC and state officials, Plaintiff continued to file further letters requesting status updates and more information about his allegations.  (Document 2 attached to ECF No. 56 at 1-7).  On August 7, 2013, Plaintiff received a letter in response to one of his letters which he sent to the "Office of the Governor/Office of Constituent Relations" on July 18, 2013.  (Document 2 attached to ECF No. 56 at 8).  In that letter, an associate from the Division of Operations within the DOC informed Plaintiff that the letter had been forwarded to her at the DOC and that she had in turn passed the letter on to individuals in the DOC's SID.  (*Id.*).  Plaintiff also filed an OPRA request with the Department of Corrections requesting copies of any investigations performed by SID in relation to the December 4, 2012 incident.  (Document 2 attached to ECF No. 56 at 9).  In response, the DOC sent Plaintiff a letter indicating that an investigation report was prepared by the SID in

8

relation to the fight, but that this record was not subject to release under OPRA because it was a criminal investigatory record and was otherwise exempt from the statute. (*Id.* at 9-10).

## II. DISCUSSION

### A. Legal Standard

Pursuant to Rule 56, a court should grant a motion for summary judgment where the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "identifying those portions of the pleadings depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A factual dispute is material "if it bears on an essential element of the plaintiff's claim," and is genuine if "a reasonable jury could find in favor of the non-moving party." *Blunt v. Lower Merion School Dist.*, 767 F.3d 247, 265 (3d Cir. 2014). In deciding a motion for summary judgment a district court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion," *Id.*, but must not make credibility determinations or engage in any weighing of the evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, [however,] there is no genuine issue for trial." *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party has met this initial burden, the burden shifts to the non-moving party who must provide evidence sufficient to establish that a reasonable jury could find in the

9

non-moving party's favor to warrant the denial of a summary judgment motion. *Lawrence v. Nat'l Westminster Bank New Jersey*, 98 F.3d 61, 65 (3d Cir. 1996); *Serodio v. Rutgers*, 27 F. Supp. 3d 546, 550 (D.N.J. 2014). "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial. However, the party opposing the motion for summary judgment cannot rest on mere allegations, instead it must present actual evidence that creates a genuine issue as to a material fact for trial." *Serodio*, 27 F. Supp. 3d at 550.

**B. Analysis**

Defendants argue in their motion that Plaintiff has failed to properly exhaust his claims administratively, and that his complaint must be dismissed as a result. Pursuant to 42 U.S.C. § 1997e, before a prisoner may file a civil rights suit challenging "prison conditions," he is required to exhaust all available administrative remedies. *Woodford v. Ngo*, 548 U.S. 81, 84-85 (2006). Indeed, a prisoner is required to "exhaust administrative remedies even where the relief sought – [such as] monetary damages – cannot be granted by the administrative process." *Id.*; *see also Booth v. Churner*, 532 U.S. 731, 734 (2001). Where an administrative remedy is available, then, a plaintiff challenging prison conditions must make use of such remedies before filing suit, and no exceptional circumstances will excuse a failure to exhaust. *See Ross v. Blake*, --- U.S. ---, 2016 WL 3128839, at *5-7 (June 6, 2016). A failure to exhaust is thus only excusable where no administrative remedy is actually available, either because there is no remedy, the administrative remedy is incapable of being used, or the prison through its staff prevents "all but the most skillful" prisoners from properly exhausting. *Id.* at *7-8.

10

"Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford*, 548 U.S. at 90-91. Thus, to properly exhaust administrative remedies, a prisoner must seek all available administrative remedies while at least substantially complying with the rules and regulations set out by the administrative body, in this case the prisons. *Id.* at 90-103; *Small v. Camden County*, 728 F.3d 265, 272 (3d Cir. 2013) (completion of the administrative review process "means 'substantial' compliance with the prison's grievance procedures"). In determining whether a prisoner has successfully exhausted, the courts look to the grievance regime of the plaintiff's prison facility to determine what steps are required to fully exhaust, and compliance with those procedures is all that is required to properly exhaust a claim. *See Jones v.* Bock, 549 U.S. 199, 218 (2007). Because exhaustion is a threshold issue affecting a plaintiff's entitlement to relief, it is for the Court, and not a jury, to determine whether a given plaintiff has properly exhausted his claims, even to the extent of resolving any factual disputes as to the exhaustion issue. *Small*, 728 F.3d at 269-71. Failure to exhaust is an "affirmative defense the defendant must plead and prove." *Id.* at 268-69.

Initially, this Court must determine whether the exhaustion requirement applies to Plaintiff and his claims. Here, Plaintiff filed a complaint raising excessive force claims against several corrections officers. (ECF No. 1). Plaintiff filed his complaint while he was still incarcerated, although was later released on or about October 8, 2015. (ECF Nos. 1; 41). The statutory exhaustion requirement applies to all suits filed by prisoners challenging prison conditions. *See* 42 U.S.C. § 1997e. The term "prisoner" includes "any person incarcerated or detained in any

11

facility who [has been] convicted of . . . violations of criminal law or the terms and conditions of parole." *Id.* at § 1997e(h). The exhaustion requirement applies to anyone who was incarcerated as a prisoner at the time he filed his complaint; that a prisoner is later released does not excuse his failure to exhaust where he filed his complaint as a prisoner. *See Ahmed v. Dragovich*, 297 F.3d 201, 210 (3d Cir 2001). As Plaintiff was incarcerated because of a state court conviction at the time he filed his complaint, the exhaustion requirement would apply to him so long as his claims concerned prison conditions. Because the exhaustion requirement *does* apply to excessive force claims brought pursuant to the Eighth Amendment, Plaintiff is subject to the exhaustion requirement. *See Booth v. Churner*, 206 F.3d 289, 298 (3d Cir. 2000), *aff'd*, 532 U.S. 731 (2001); *see also Porter v. Nussle*, 534 U.S. 516, 532 (2002) (the "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong").

It is also clear from the record presented that the administrative remedies described by Ms. Smith in her certification were "available" to Plaintiff. Among the documents submitted by Defendants in their motion for summary judgment are several grievances that Plaintiff filed while within New Jersey State Prison. The earliest of these documents is a grievance filed by Petitioner on January 10, 2013, approximately a month after Plaintiff's transfer to the prison facility. (*See* Document 3 attached to ECF No. 54 at 27). Likewise, Plaintiff's prison records show that he underwent orientation on December 21, 2012, which according to Ms. Smith included a refresher on the rules for the exhaustion of administrative remedies and the filing of prison grievances. (*See* Document 3 attached to ECF No. 54 at 19). The letter Plaintiff sent to Gary Lanigan in response to the grievance he claims he mailed to Northern State Prison is dated January 29, 2013, and asserts

that Plaintiff mailed his initial complaint approximately a month earlier, around the time that he underwent his orientation and rule refresher.[1] (*See* Document 2 attached to ECF No. 56 at 1). Plaintiff also appears to have filed several grievances prior to his transfer using similar procedures at Northern State Prison. (Document 3 attached to ECF No. 54). It is thus clear from the record that the New Jersey State Prison grievance system was available to Plaintiff, that he was made aware of the rules for using that system shortly after his transfer, and that Plaintiff understood those rules enough to file at least one IRF prior to his sending a letter to Gary Lanigan in January 2013.

Thus, the question here is whether Plaintiff properly exhausted his claims by at least "substantially" complying with the prison's rules in filing administrative complaints. The record in this matter indicates that Plaintiff did not. At his deposition, Plaintiff admitted that, rather than place his IRFs regarding the fight incident in the appropriate box in his housing unit or give the form to an officer to place in that box, he placed IRFs in the mail and sent them to Northern State Prison where he was no longer housed. According to the certification provided by Ms. Smith, all prisoners, including Plaintiff, are informed that IRFs will not be accepted if they are not filed by being placed in the appropriate box by either the prisoner himself or his housing unit officer if the prisoner is not in general population. As Plaintiff mailed his forms to Northern State Prison rather than place them in the box as required by New Jersey State Prison's rules, Plaintiff failed to comply with the procedural rules governing his exhaustion of administrative remedies, and thus failed to

---

[1] This Court notes, however, that Plaintiff has provided no documentary evidence regarding his sending this IRF to Northern State Prison in December 2012, whereas he has provided mail receipts and copies of letters he sent to DOC officials in January and June 2013. (*See* Document 2 attached to ECF No. 56 at 1-7).

properly exhaust his claims. That Plaintiff continued to send letters to high ranking officials in the State of New Jersey or DOC does not repair the basic problem with Plaintiff's attempts at exhausting this claim – Plaintiff failed to follow the proper procedures in filing his IRF, and as such his allegedly mailed IRF was not accepted. Because Plaintiff did not exhaust his claims by following the proper procedure for filing an IRF, instead mailing the form to Northern State Prison, Plaintiff failed to properly exhaust his claims. *See Woodford*, 548 U.S. at 90-91. Likewise, because prisoners are directly informed that filing an IRF by means other than placing it in the appropriate box will result in rejection of the form, and as it is clear that Plaintiff knew how to properly file such forms at New Jersey State Prison at least by mid-January 2013, Plaintiff's mailing of an IRF to Northern State Prison and various DOC officials cannot be said to amount to "substantial compliance" with the prison's rules. It thus appears that Plaintiff has failed to exhaust his claims, and that he was thus barred from bringing his current suit until such time as he did so exhaust.

One issue which complicates matters slightly in this case is the fact that, after his fight with Defendant Bergus at Northern State Prison, Plaintiff was transferred to New Jersey State Prison that same day. A prisoner's transfer from one institution to another, however, does not relieve him of his obligation to exhaust his claims, nor does transfer render administrative remedies "unavailable." *See Jackson v. Grundy*, 877 F. Supp. 2d 159, 176-77 (D.N.J. 2012); *see also Williamson v. Wexford Health Sources, Inc.*, 131 F. App'x 888, 890 (3d Cir. 2005). Thus, Petitioner's transfer did not alleviate the requirement that he exhaust his claims by filing a grievance and appealing any adverse decision of that grievance as provided by the prison's rules. *Williamson*, 131 F. App'x at 890. Plaintiff neither filed a grievance at New Jersey State Prison,

14

nor filed a follow up at that prison after filing such a grievance and not receiving a response, as is provided in the prison's rules. Instead, he mailed a grievance back to Northern State Prison, which does not comply with the rules, and then mailed further letters to various DOC officials outside of New Jersey State Prison when he didn't hear back from his initial improper filing. Thus, regardless of Plaintiff's transfer, he did not substantially comply with the rules for filing his grievance as he chose to use a mechanism – the general mail – which is not acceptable under the prison's rules. That Plaintiff filed and received a response to grievances in January and February 2013 clearly show that he was aware of the proper mechanism shortly after his transfer, and chose not to use it in response to this incident. Thus, transfer or no, the evidence in the record shows that Plaintiff failed to comply with New Jersey State Prison's policies, and thus failed to exhaust his claim.[2]

In response to Defendants' arguments, Plaintiff first argues that his claims should be considered exhausted because he was acquitted of the disciplinary charges brought against him following the fight. In making that argument, Petitioner relies on the Third Circuit's opinion in *Camp v. Brennan*, 219 F.3d 279, 281 (2000). In *Camp*, the Third Circuit held that, where "the ultimate administrative authority" had already essentially reviewed the merits of a prisoner's complaint and rejected the complaint prior to Plaintiff's ability to exhaust his remedy, the claim had, for all intents and purposes, been exhausted as the highest authority capable of reviewing any

---

[2] Plaintiff has submitted nothing in response to the motion for summary judgment which would indicate to whom at Northern State Prison he mailed his improper grievance, nor any documents to suggest that such a mailing would have complied with any alternative grievance procedures at Northern State Prison. Thus, nothing in the record suggests that Plaintiff's decision was procedurally proper.

administrative remedy had already rejected the prisoner's claims. *Id.* Plaintiff, in turn, argues that because he was found not guilty of the disciplinary charges leveled against him because of the December 2012 incident, the prison has already considered his claims on the merits, and that he is therefore not required to further exhaust them. Plaintiff's contention, however, ignores several key differences between his case and *Camp*. Plaintiff's disciplinary charges were dismissed by a hearing officer after Northern State Prison failed to turn over any evidence to support the charges. Nothing in the record suggests that this hearing officer amounted to an "ultimate administrative authority," and the certification of Ms. Smith indicates that such authority would either be the prison administrator or his designated representative. Likewise, Plaintiff's disciplinary charges dealt with whether *Plaintiff* attacked Officer Bergus and not whether *Bergus* used excessive force against Plaintiff. Thus, the issue before the hearing officer, while related to Plaintiff's claims, was qualitatively different from Plaintiff's current excessive force claim. That Plaintiff did not assault the officer in and of itself is not dispositive of the assertion that the officer was not warranted in his use of force upon Plaintiff. Thus, *Camp* is entirely distinguishable from the case at bar, and provides Plaintiff no support.

Plaintiff further argues that he should be considered to have exhausted his claims because he "attempted" to exhaust his remedies by mailing out copies of his IRF to Northern State Prison and to various N.J. DOC officials, by being interviewed by an SID officer after the fight, and in so much as he filed an OPRA request seeking the SID officer's reports in summer 2013 which was denied. The inherent problem with each of these assertions, however, is that the statute does not simply require that a Plaintiff attempt to exhaust his claims, but that a Plaintiff actually exhaust all available administrative remedies by at the least substantially complying with the rules and

16

procedures set forth by the administrative body, in this case Department of Corrections and the prisons in which Plaintiff was housed. *See Woodford*, 548 U.S. at 90-91 (exhaustion of remedies requires compliance with the procedural rules put into place by the prison); *Small*, 728 F.3d at 269-71. Plaintiff's mailing of a grievance to persons unknown at Northern State Prison does not substantially comply with the grievance procedure in place in the New Jersey prisons as that procedure requires placement of any and all IRFs in the appropriate box at the prison by the prisoner or the appropriate prison staff member. As Plaintiff did not substantially comply with the procedure in place at New Jersey State Prison in filing his grievance, he failed to exhaust all available administrative remedies, and was thus precluded from filing his current complaint. This Court must therefore grant Defendant's motion for summary judgment to the extent that it seeks the dismissal of Plaintiff's complaint for failure to exhaust.[3]

### III. CONCLUSION

For the reasons stated above, this Court grants in part Defendants' motion for summary judgment and will dismiss Plaintiff's complaint for failure to properly exhaust his administrative remedies. An appropriate order follows.

s/ Susan D. Wigenton, U.S.D.J.

Orig:      Clerk
cc:        Parties

---

[3] In their motion, Defendants also argue that they are entitled to qualified immunity and that judgment should be entered in their favor as to Plaintiff's excessive force claims as a result. Because this Court will dismiss Plaintiff's complaint for failure to exhaust, the Court need not and will not address that argument.